# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2622

_____

| | | |
|---|---|---|
| In re: Hutchinson Technology, Inc. | * | |
| Securities Litigation, | * | |
| | * | |
| -------------------- | * | |
| | * | |
| NECA-IBEW Pension Fund, on | * | |
| behalf of itself and all others | * | |
| similarly situated, | * | Appeal from the United States |
| | * | District Court for the |
| Appellant, | * | District of Minnesota. |
| | * | |
| v. | * | |
| | * | |
| Hutchinson Technology, Inc.; | * | |
| Jeffrey W. Green; Wayne M. Fortun; | * | |
| John A. Ingleman; Richard J. Penn; | * | |
| R. Scott Schaefer; Beatrice A. Graczyk, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 10, 2008
Filed: August 5, 2008 (Corrected: 8/7/2008)

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

NECA-IBEW Pension Fund ("NECA"), lead plaintiff, brought a securities-fraud action against Hutchinson Technology Inc. ("Hutchinson") and six of

Hutchinson's officers and directors.[1] NECA brought this action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and under the Securities and Exchange Commission's ("SEC") implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5. NECA also brought claims of controlling person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t. NECA sued on behalf of itself and all who purchased Hutchinson common stock between October 4, 2004 and August 29, 2005 ("the class period"). Hutchinson filed a motion to dismiss NECA's complaint, and the district court[2] granted the motion. The district court also denied NECA's motion for leave to amend the complaint. NECA appeals the district court's dismissal of its complaint, arguing that it met the requirements of the Private Securities Litigation Reform Act (PSLRA). In addition, NECA argues that the district court erred in dismissing its 15 U.S.C. § 78t "controlling persons" claims and in denying leave to amend the complaint. We affirm.

## I. *Background*

Because NECA's appeal arises from the district court's grant of a motion to dismiss, we draw the relevant facts from the class complaint. *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1082 (8th Cir. 2005).

Hutchinson is a leading manufacturer and supplier of suspension assemblies for all sizes and types of computer hard disk drives. Suspension assemblies are critical components of disk drives that hold the recording heads of the drives in a position above spinning magnetic disks. In fiscal year 2005 ("FY05"), Hutchinson's five largest

---

[1]The appellee officers and directors include: Jeffrey W. Green, chair of board of directors; Wayne M. Fortun, president and CEO; John A. Ingleman, vice president and CFO; Richard J. Penn, vice president of operations; R. Scott Schaefer, vice president and chief technical officer; and Beatrice A. Graczyk, vice president of business development.

[2]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

customers for suspension assemblies accounted for almost 90% of its net revenue, and sales of suspension assemblies accounted for 95% of Hutchinson's total net revenue.

On October 4, 2004, the first day of the class period, Hutchinson reported that it expected to exceed its guidance[3] for the fourth quarter of 2004 ("4Q04"), which ended on September 26, 2004. Previously, in a guidance given during July 2004, Hutchinson had said it expected to report 4Q04 earnings per share (EPS) of breakeven to $0.10. However, in this announcement, on the first day of the class period, Hutchinson reported EPS of $0.15 to $0.20 for 4Q04, exceeding its predicted EPS. In this same announcement, Hutchinson reported that it expected demand for its products to increase in 1Q05. In response to this announcement, on October 5, 2004, Hutchinson's stock price increased from $30.93 to $34.09.

On November 1, 2004, in line with the above prediction, Hutchinson released its 4Q04 financial results, and the company reported EPS of $0.18. On the same day, Hutchinson executive officers Fortun and Ingleman hosted a conference call for analysts and investors, and during the call, president Fortun stated that "Overall, we continue to expect suspension assembly demands to trend upward." However, Hutchinson's stock price fell to around $30.00 per share. Over the next few days, after the stock price declined further, company officers Fortun, Ingleman, Graczyk, Schaefer, and Penn sold a combined total of 137,750 shares of Hutchinson stock at $29.04 to $30.02 per share, receiving about $6 million in net proceeds.

On December 9, 2004, Hutchinson filed its Form 10-K with the SEC which reaffirmed Hutchinson's previously announced financial results and disclosed that

---

[3]A guidance is "information that a company provides as an indication or estimate of its future earnings." *See* http://www.investopedia.com/terms/g/guidance.asp (last visited July 18, 2008).

Hutchinson had increased the allowance for sales returns[4] by $1,327,000 for 4Q04 and by $3,797,000 for FY04. The increases in return allowances for FY03 and 4Q03 had been larger. The FY04 Form 10-K also included Sarbanes-Oxley certifications signed by Fortun and Ingleman.

On January 10, 2005, Hutchinson announced that it had exceeded an earlier shipment guidance for 1Q05, and on January 20, 2005, Hutchinson released its 1Q05 financial results. On both dates, Fortun stated that demand for suspension assemblies in 1Q05 was stronger than the company had expected. On a January 20, 2005, conference call for analysts and investors, Fortun reported that "at current levels of demand we are operating at close to full capacity" and that Hutchinson was "struggling to figure out how we're going to meet the general demand requirements and build some inventory at the same time . . . we don't know if we're going to necessarily make that happen." A few days later, executives Graczyk and Schaefer sold a combined total of 26, 820 shares of Hutchinson stock at $33.55 to $34.00 per share, resulting in net proceeds of almost $1 million. On February 3, 2005, Hutchinson filed its Form 10-Q with the SEC in which it reiterated previously announced financial results and included Fortun's and Ingleman's Sarbanes-Oxley certifications. The Form 10-Q reported that Hutchinson's return allowances were increased by $745,000 in 1Q05, which was a smaller increase than that of 1Q04.

On March 31, 2005, Hutchinson again announced that it had exceeded an earlier shipment guidance, this time for 2Q05. In the related press release, Fortun said that demand grew steadily through the quarter and that Hutchinson planned to increase manufacturing capacity from approximately 15 million suspension assembly units per week to 20 million units per week. To facilitate this growth, Hutchinson had increased its FY05 capital spending budget from $120 million to $220 million.

---

[4]The allowance for sales returns, or return allowance, is based on the company's estimate of the amount of product customers will return.

On April 21, 2005, Hutchinson released its 2Q05 financial results and stated that demand was strong industry wide. On that same day, during a conference call with investors and analysts, Fortun said that "We believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months" and "We have been on a forced march since about mid-November last year. We have not been able to hold inventories to where they need to be . . . . We're going to have to really scramble to stay with it." The next day Hutchinson's stock price went up to $36.93. On April 26, 2005, Graczyk sold a combined total of 19,670 shares of Hutchinson stock at $37.96 to $38.16 per share, resulting in approximately $750,000 of net proceeds. The next day Hutchinson filed its 2Q05 Form 10-Q which included previously announced financials, Fortun's and Ingleman's Sarbanes-Oxley certifications and a report that Hutchinson's return allowance was being increased by $824,000, which was more than the amount the allowance had increased in 2Q04.

On July 21, 2005, near the end of the class period, Hutchinson announced that it had not met its 3Q05 shipment projections because of "capacity constraints" and had only met its income projection due to a tax refund it had received. Hutchinson noted that the gross margin increase in 3Q05 "was partially offset by inefficiencies resulting from operating at peak capacity while bringing new units into production and by higher costs for expedited production and shipping." However, Hutchinson also reported that demand remained strong, shipments and sales prices exceeded both the previous quarter and 3Q04, and it expected sales to increase in 4Q05. The day after this announcement Hutchinson's stock price dropped from $37.90 to $32.99. A few days later Fortun, Ingleman, and Green sold a combined total of 154,300 shares of Hutchinson stock at $32.91 to $33.83 per share, resulting in net proceeds over $5 million.

One day after the end of the class period, on August 30, 2005, Hutchinson issued a press release revising its 4Q05 financial projections. The release announced

that lower demand and a shift in product mix would reduce 4Q05 sales and earnings. Following this announcement, Hutchinson's stock price dropped from $31.51 to $26.16.

The complaint includes allegations from five confidential witnesses (CWs). Confidential Witness No. 1 ("CW1"), a manufacturing supervisor at Hutchinson's Sioux Falls, South Dakota manufacturing plant, indicated that beginning in May 2005 there was a significant increase in detection and production of defective suspension assemblies. According to CW1, Hutchinson customers returned approximately one million assemblies per week to the Sioux Falls plant from May 2005 through December 2005 when he left Hutchinson. CW1 claimed that in the six months before May 2005, Hutchinson's product return rate had increased by 75% and approximately 50% of the returned defective assemblies were not reusable. By June 2005, according to CW1, the Sioux Falls plant began missing its production quotas.

According to CW2, a quality engineering manager at Hutchinson's Plymouth, Minnesota plant, from November 2004 through June 2005 Hutchinson added approximately 10% additional capacity each quarter. During this same period, CW2 stated that Hutchinson's production of defective product increased from 8% of total units produced to 15% of total units produced. CW2 said that each week the plant manager at the Plymouth, Minnesota plant would create a "weekly activity report" that detailed the plant's production for the week, and the report was emailed to vice president Penn. CW2 noted that if there were any product yield problems, the report would contain the plant manager's analysis of the "root cause" of the problem and what steps were being taken to correct the problem.

CW3, one of Hutchinson's plant managers who reported to Penn, said that plant managers were responsible for producing weekly reports to Penn's executive assistant detailing output, product yield, scrap rates, quality control issues, and production problems that occurred during the week. CW3 stated that Penn's executive assistant

created a consolidated report, after receiving all of the individual reports, which was then forwarded back to each plant manager. According to CW3, in September 2004, one of Hutchinson's major customers began returning approximately 500,000 suspension assemblies per week over the course of a month because of defective parts.

CW4, a human resources manager at the Eau Claire, Wisconsin plant, participated in weekly video conference calls with Hutchinson plant managers and executives Fortun, Penn, Graczyk, Ingleman and Schaefer. These calls, according to CW4, focused on weekly plant manager review reports. Call participants discussed suspension assembly output, production projections and production problems. CW4 said that the weekly reports informed all individual defendants that for each 10% increase in production capacity, Hutchinson experienced a 22.5% increase in the product defect rate.

CW5 was a human resource generalist at the Eau Claire, Wisconsin plant. According to CW5, the number of defective disk drive suspension assemblies noticeably increased during the class period.

In response to the class complaint, Hutchinson and the individual defendants filed a motion to dismiss. The district court granted the motion to dismiss, holding that the complaint did not meet the heightened pleading standards for falsity and scienter required by the PSLRA. *See* 15 U.S.C. § 78u-4(b). The court also dismissed the Section 20 "controlling persons" claim, finding that it was derivative of NECA's Section 78j(b) claim. *See* 15 U.S.C. § 78t. The district court further found that amending the complaint would be futile and thus denied NECA leave to amend.

II. *Discussion*

On appeal NECA argues that the district court erred in: (1) holding that NECA failed to state a claim under the requirements of the PSLRA; (2) dismissing its 15 U.S.C. § 78t "controlling persons" claim; and (3) denying leave to amend the complaint.

A. *Standard of Review*

We review the district court's grant of a motion to dismiss a securities fraud complaint de novo. *In re Cerner Corp. Sec. Litig.*, 425 F.3d at 1083. We may affirm the district court's dismissal of the complaint if NECA can prove no set of facts that would entitle it to relief. *Id.*

Also, "[a]s a check against abusive litigation by private parties, Congress enacted the [PSLRA]. Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, — U.S. —,127 S. Ct. 2499, 2504 (2007) (internal citation omitted). The PSLRA heightens the Federal Rule of Civil Procedure 12(b)(6) standard in two important ways. First, the PSLRA provides that to survive a motion to dismiss, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Although we construe the complaint liberally and accept the facts pleaded as true, we reject unwarranted inferences and conclusory or catch-all assertions of law. *In re Cerner Corp. Sec. Litig.*, 425 F.3d at 1083.

B. *Falsity*

NECA argues that it alleged, with the specificity required by the PSLRA, that Hutchinson made materially false or misleading statements.

> In order to satisfy the Reform Act's falsity pleading standard, a complaint may not rest on mere allegations that fraud has occurred. Instead, the complaint must indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they

were made. In other words, the complaint's facts must necessarily show that the defendants' statements were misleading.

*Id.* at 1083 (internal citations and quotations omitted).

NECA's complaint alleges two types of false and misleading statements during the class period. First, NECA alleges that Hutchinson's reported financial results during the class period, i.e. EPS, were false and misleading because return allowances were understated. Second, NECA alleges that individual defendants, such as Fortun and Ingleman, made false and misleading statements regarding customer demand, Hutchinson's ability to meet demand, and sales and earnings projections.

NECA alleges that return allowances were too low during the class period and therefore, Hutchinson's EPS were overstated. NECA claims that financial statements regarding EPS were false because during the class period product quality was down and the number of defects were up, as were returns.[5]

NECA claims that the increases in return allowances through the class period were inadequate because customer return rates and product defect rates were rapidly increasing. NECA focuses on the increases in return allowance for 4Q04, 1Q05, and 2Q05. NECA argues that for 4Q04 the return allowance increase was 22.5% lower than it should have been. For 1Q05, NECA argues that the return allowance increase was 168.5% lower than it should have been. And the return allowance for 2Q05, NECA alleges, was 191% lower than it should have been.

These numbers, and the backbone of NECA's allegations, come from statements made by the CWs. NECA relies on the statements made by CW2 that from November 2004 through June 2005 Hutchinson added 10% additional capacity each quarter, and

---

[5]Specifically, NECA alleges that Hutchinson violated Financial Accounting Standard No. 5, "Accounting for Contingencies."

the product-defect rate increased from 8% to 15% of total units produced. NECA alleges that for each 10% increase in production per quarter from November 2004 to June 2005, Hutchinson generated 22.5% more defective products per quarter. NECA also relies on CW1's statement that customer returns increased 75% from late 2004 through May 2005. NECA alleges that because quarterly return allowances were not increasing at rates higher than they had in the previous year the increases were inadequate.

NECA's allegations that earnings were overstated fail under the PSLRA because they are either bare allegations or allegations supported by anecdotal information about specific customers with no historical context. As the district court noted, CW1 provided the only basis for an allegation of an actual increase in the customer return rate, and without any allegations showing the basis of CW1's knowledge, NECA's claim that the return allowances were inadequate because of rising customer returns does not meet the standard of the PSLRA. Nothing in the complaint puts the returns spoken of by CW1 in perspective or suggests that they were something other than normal business fluctuations. And these anecdotes offered by the CWs about specific plants and specific customers are the only information that support the claim that return allowances were inadequate. For example, the complaint alleges, according to CW3, that in September 2004 one customer returned 500,000 assemblies per week for one month. Events at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard. *See In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 549–50 (8th Cir. 2004) (Wollman, J., concurring) (stating that a complaint that described problems on individual projects staffed by the defendant and a number of general impressions shared by lower-level employees and contractors was not enough to show that the defendant's representations about strong demand were false). Allegations that production and errors were up at certain plants is not enough to support a claim that Hutchinson knew their company-wide EPS statements were false. We agree with the district court that without allegations showing the basis of CW1's knowledge, NECA's claim that return allowances were inadequate is not sufficient under the PSLRA.

NECA has not even alleged that the returns materially exceeded the return allowances. Instead, NECA relies on the CWs' statements. Even under prior, less rigorous pleading standards, NECA needed to plead facts that showed that the allowances were ultimately inadequate. *See In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) ("Even under the liberal pleading requirements of Federal Rule of Civil Procedure 8(a), the district court found that the Appellants had failed to state any facts to support their claim. Notably missing was any fact alleged in the complaint that indicated Acceptance's reserves were inadequate in light of the Montrose decision"). Hutchinson has never restated its financials, and there are no people, documents, or sources that say Hutchinson's numbers were false.

NECA also bases its claims on Hutchinson's public statements made regarding demand along with sales and earnings projections. NECA claims that Hutchinson made a series of misstatements when it reassured investors of strong and increasing demand that continued to trend upward. Specifically, NECA points to public statements made by Fortun and Ingleman in company press releases and conference calls, expressing that Hutchinson expected demand for suspension assemblies to grow or at least continue to be strong and that Hutchinson would increase capacity to meet the expected demand. NECA's allegations regarding Hutchinson's public statements are deficient. We agree with the district court that nothing in the complaint explains how or why these statements are false. Instead, the complaint indicates that there was growth in demand for suspension assemblies and Hutchinson planned to expand its production capacity to meet that demand. NECA's contention that Hutchinson's statements about increased demand and operating at capacity are false is at odds with the remainder of the complaint which, as explained above, alleges that Hutchinson's problem was that it could not keep up with demand and it did not adequately account for the product defects that come with operating at maximum capacity.

NECA highlighted Fortun's April 21, 2005, statement that "We believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months" as the best example of a public demand-

related false statement. The district court found this statement, and similar ones made by Hutchinson, too vague and too much like puffing to be material. We agree.

> [S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them. The role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time . . . soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (internal quotations and citations omitted).

NECA also alleges that Hutchinson's statements about future sales and earnings were materially false or misleading. However, NECA alleges no facts showing those statements were false when made.

> Simply alleging that defendants made a particular statement at a given time, without providing further particulars about who made the statement or when, and then showing in hindsight that the statement is false misses the PSLRA pleading requirement. Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.

*In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002) (internal quotation and citation omitted). Even if NECA is correct that Hutchinson's sales and earnings projections were off, no facts alleged support the inference that those statements were false when made.

We hold that NECA has failed to allege that Hutchinson made any materially false or misleading statements with the specificity required by the PSLRA.[6] Because we hold that NECA's complaint fails to meet the falsity pleading standard, we need not address its contention that it sufficiently pleaded scienter.

## C. *Control-Person Liability*

NECA also appeals the district court's dismissal of its controlling person liability claims. *See* Section 20 of the 1934 Act, 15 U.S.C. § 78t. Pursuant to 15 U.S.C. § 78t(a), "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . ."

However, as the district court found, NECA cannot pursue a Section 78t claim because a Section 20 claim is derivative and requires an underlying violation of the 1934 Act. *See Deviries v. Prudential-Bache Sec., Inc.*, 805 F.2d 326, 329 (8th Cir. 1986) (holding that Deviries's Section 20 claim was derivative of his other 1934 Act claims, and without an underlying violation of the 1934 Act or any rule or regulation promulgated under its authority, Deviries could not state a claim under Section 20. Accordingly, the dismissal of his other 1934 Act claims was fatal to his Section 20 claim).

---

[6]NECA also argues that Graczyk and Schaefer should be held responsible for Hutchinson financial reports and other class period statements under the "group pleading" doctrine. *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005) ("That exception is premised on the assumption that '[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other group-published information, it is reasonable to presume that these are the collective actions of the officers'"). However, because we have held that NECA's complaint is insufficient under the PSLRA we need not consider the issue of whether this doctrine survived the PSLRA or whether the doctrine applies here.

Because we hold that the district court did not err in dismissing NECA's § 78j(b) and Rule 10b-5 claims, we also affirm the dismissal of NECA's controlling person claims.

## D. *Leave to Amend*

Finally, NECA argues that the district court erred in denying leave to amend its complaint.

> Leave to amend should be granted freely when justice so requires. Nevertheless, futility is a valid reason for denial of a motion to amend. Where the district court's holding that amendment would be futile is based upon its finding that no actual amendments to the complaint are possible, we review the denial of leave to amend for abuse of discretion. Where the district court's denial of leave to amend based upon futility is in turn based upon a finding that a specific allegation, even if amended, would fail to state a claim as a matter of law, we review the denial de novo.

*In Re Cerner Corp. Sec. Litig.*, 425 F.3d at 1086 (internal alterations, citations, and quotations omitted).

"We need not attempt to ascertain the basis of the district court's ruling, however, because we would affirm the district court's decision under either standard." *Id*. After oral argument to the district court, NECA submitted the following information that, if added to the complaint, purportedly would show that Hutchinson's return allowances turned out to be inadequate: (1) Hutchinson's 2Q06 and 3Q06 Form 10-Qs showing increases in Hutchinson's allowance related to warranties issued; (2) Hutchinson's November 2, 2006, Form 8-K reporting an adjustment to certain revenue recorded in 2004 and 2005; and (3) Hutchinson's FY06 Form 10-Q which disclosed that the SEC had opened an investigation and requested information related to some of the allegations in this lawsuit.

These amendments would not save the complaint. First, the 2Q06 and 3Q06 fiscal data relates to actions outside the class period. Hutchinson's 2Q06 and 3Q06 Form 10-Qs reported increases in Hutchinson's allowance related to warranties issued. NECA speculates that these increases in allowances represent correction for products sold during the class period. The district court found that NECA has offered nothing other than speculation that the 2Q06 and 3Q06 numbers relate to the class period, and we agree. Second, we also agree with the district court that without further information about Hutchinson's adjustment of its financial results, there is no basis for concluding that the revenue adjustments show fraud or show how Hutchinson calculates its return allowances. And, lastly, we consider the SEC's opening and closing an investigation irrelevant to the issue of NECA's complaint sufficiency. The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false and it does not render Fortun's statements that Hutchinson was "well-positioned" material nor does it add an inference of scienter. Under either an abuse of discretion or a de novo standard of review, we agree with the district court that NECA has not shown that any potential amendment would save its complaint.

## III. *Conclusion*

Accordingly, we affirm the district court's dismissal of NECA's complaint as well as its denial of leave to amend the complaint.

———————————————

-15-