*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0433p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JANICE KONKOL et al.,

        *Plaintiffs-Appellants,*

       *v.*

DIEBOLD, INC. et al.,

        *Defendants-Appellees.*

No. 08-4572

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 05-02873—Peter C. Economus, District Judge.

Argued: October 14, 2009

Decided and Filed: December 22, 2009

Before: GILMAN and GIBBONS, Circuit Judges; ANDERSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Geoffrey M. Johnson, SCOTT & SCOTT, LLP, Cleveland Heights, Ohio, for Appellants. John M. Newman, Jr, JONES DAY, Cleveland, Ohio, for Appellees. **ON BRIEF:** Geoffrey M. Johnson, SCOTT & SCOTT, LLP, Cleveland Heights, Ohio, for Appellants. John M. Newman, Jr, Geoffrey J. Ritts, JONES DAY, Cleveland, Ohio, John F. McCaffrey, MCLAUGHLIN & MCCAFFREY, Cleveland, Ohio, John D. Parker, BAKER & HOSTETLER, Cleveland, Ohio, D. Jeffrey Ireland, Martin A. Foos, FARUKI, IRELAND & COX P.L.L., Dayton, Ohio, Donna M. Donlon, MCKENNA LONG & ALDRIGE, LLP, Washington, D.C., for Appellees.

_____

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

1

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.   Janice Konkol and several other investors filed a class-action securities-fraud lawsuit against Diebold, Inc. (Diebold or the Company), alleging that between 2003 and 2005 Diebold engaged in a series of schemes to prematurely recognize revenue in order to inflate the price of its stock. Holding that the investors' complaint failed to sufficiently allege scienter, the district court dismissed the lawsuit for failure to state a claim.   The investors appeal that holding, as well as the district court's failure to explain its refusal to allow them to file a second amended complaint.   For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.    Factual background**

Diebold, a publicly-owned Ohio corporation, manufactures, distributes, and services electronic voting machines and Automated Teller Machines (ATMs).   In addition to Diebold, the complaint named nine individual defendants, all of whom were employed by Diebold in senior management positions during the "Class Period" between October 22, 2003 and September 21, 2005 (these individuals are hereinafter referred to as the Defendants).   All of the investors purchased Diebold stock during the Class Period.   They filed suit in April 2007, alleging that the Defendants manipulated Diebold's revenue during the Class Period through three primary schemes:

> First, Defendants purposely caused Diebold to improperly recognize revenue . . . for voting machines sold to California and Ohio counties even though Defendants knew that the machines were not in compliance with federal and state "certification" requirements and had not been fully delivered and accepted by the state and local governments;
>
> Second, Defendants caused Diebold's service representatives to send out phony invoices at the end of each financial quarter to artificially inflate revenue in order to meet the Company's revenue and earnings targets;

> Third, Defendants systematically bundled together the Company's software products with post-delivery training, maintenance, follow-up services and rights to software updates, and then prematurely booked revenue for the portions of the sale that had not yet been earned.

According to the investors, the Defendants "purposely decided to ignore" generally accepted accounting principles (GAAP) "and booked millions of dollars of revenue before it was actually earned, choosing to lie to investors and issue false earnings announcements and financial statements in violation of federal securities laws."

**B.        Procedural history**

Diebold and the Defendants filed a motion to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, in July 2007. Before the district court ruled on that motion, the investors filed a motion to amend their complaint for a second time. Without explicitly addressing the investors' motion to amend, the district court dismissed the complaint in its entirety in August 2008. The investors have timely appealed both the dismissal of their lawsuit and the district court's failure to explain its refusal to allow them to file a second amended complaint.

## II. ANALYSIS

**A.        Standard of review**

The investors allege that Diebold and the Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 (the Act) and Rule 10b-5 promulgated thereunder, which prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *See Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002). They also allege that the Defendants violated Section 20(a) of the Act, which imposes control-person liability on "[e]very person who, directly or indirectly, controls any person liable" under the Act and accompanying rules, unless "the controlling person acted in good faith and did not directly or indirectly" induce the illegal acts. *See* 15 U.S.C. § 78t(a). Such a control-liability claim is contingent upon the investors' ability to establish an "underlying" violation of Section 10(b) and Rule 10b-5. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004).

The investors' lawsuit is thus a securities-fraud action, which falls under the requirement of Rule 9(b) of the Federal Rules of Civil Procedure that claims of fraud be plead with particularity. *See PR Diamonds*, 364 F.3d at 681. Moreover, the Private Securities Litigation Reform Act of 1995 (PSLRA) "imposes additional and more '[e]xacting pleading requirements' for pleading scienter in a securities fraud case." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (alterations in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Securities-fraud plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This "at least as compelling" standard replaced the old standard used by this court, which provided that "plaintiffs are entitled only to the *most plausible* of competing inferences." *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (emphasis added).

Negligence alone on the part of a defendant cannot support a finding of scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 200-01 (1976). Recklessness, however, "is a sufficiently culpable state of mind for liability under [section] 10(b) and Rule 10b-5." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir. 1979). This court has long defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 1025.

The investors allege that the Defendants made fraudulent misstatements in Diebold's quarterly and annual press releases and conference calls from the third quarter of 2003 through the second quarter of 2005. In these press releases and conference calls, the Defendants touted the strength of Diebold and its record earnings and sales figures. These statements were allegedly false because the figures were not the result of

Diebold's legitimate business operations, but were instead the result of the Defendants' scheme to prematurely recognize revenue.

The investors also allege that the Defendants made fraudulent misstatements in Diebold's quarterly and annual Securities and Exchange Commission (SEC) filings during the Class Period. Each of these filings contained a certification that the reported earnings represented the actual financial condition of Diebold, that Diebold's internal disclosure controls were effective, and that Diebold's revenue-recognition policy and practice was to account for revenue according to the terms of the relevant contract and to recognize service revenue when it was actually earned.

We must therefore analyze the investors' complaint to determine whether the facts alleged, taken as true, give rise to a strong inference that the Defendants were at least reckless as to the falsity of these statements and whether that inference is at least as compelling as any inference of nonfraudulent intent. Our analysis is de novo because the district court dismissed the investors' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 377 (6th Cir. 2009).

**B.        Investors' request for a remand**

As an initial matter, the investors argue that because the district court applied the now-overruled "most plausible" pleading standard from *Helwig*, we should remand the case and instruct the district court to apply the *Tellabs* standard. *See Frank*, 547 F.3d at 571 (remanding a securities-fraud case back to the district court because it erroneously applied the *Helwig* standard). Although the earlier portion of the district court's opinion in the present case does contain scattered references to the "most plausible" standard that was overruled in *Tellabs*, the record reflects that the court ultimately applied the correct standard. The court, citing *Tellabs*, specifically acknowledged that it must "ask: 'would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" Remand is therefore unnecessary.

**C.    Alleged evidence of scienter**

The investors' complaint pleads two sets of facts as evidence that the Defendants either knew or were reckless as to the falsity of the earnings statements and SEC certifications.  First, the investors allege that scienter can be inferred from the fact that the Defendants had access to and actually used detailed financial reports and real-time accounting software, and that they attended weekly high-level accounting meetings.  Second, the investors allege that scienter can be inferred from the suspicious timing of insider sales of Diebold stock by the Defendants.  Both sets of alleged facts are analyzed below.

*1.    Defendants' access to financial information*

"[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."  *PR Diamonds*, 364 F.3d at 688 (holding that the defendants' access to financial reports and control over public earnings statements were insufficient to support a finding of scienter absent more particular facts).  The investors' complaint alleges access to information, but it lacks sufficiently detailed facts regarding the financial reports, how they were used, and their connection to the Defendants.  There are no allegations, for example, as to whether the reports were used to produce the earnings press releases and SEC reports, whether they were ever compared to other reports that accurately reflected revenue, or whether the Defendants were the ones who created the reports.

"In the absence of greater particularity, we have no way of distinguishing the plaintiffs' allegations from the countless fishing expeditions which the PSLRA was designed to deter."  *Fischer v. Vantive Corp. (In re Vantive Corp. Secs. Litig.)*, 283 F.3d 1079, 1087 (9th Cir. 2002) (alterations, citation, and internal quotation marks omitted).  Generalized facts alleging that the Defendants had access to Diebold's financial information, in short, do not support a *strong* inference that the Defendants knew of or recklessly disregarded the falsity of Diebold's earnings statements and SEC certifications.  *See PR Diamonds*, 364 F.3d at 688 (citing *In re Peritus Software Servs., Inc. Secs. Litig.*, 52 F. Supp.2d 211, 228 (D. Mass. 1999) (holding that general

allegations that a defendant, through his executive position, had access to internal corporate information and therefore had actual knowledge of misstatements or reckless disregard for the truth were insufficient to support a strong inference of scienter)). The standard from *Tellabs* requires *specific* facts that those reports were known to Defendants and reflected the revenue-recognition scheme in such a way that it would have been obvious that Diebold was improperly inflating its revenue. *See In re Peritus Software Servs.*, 52 F. Supp. 2d at 228 (rejecting an allegation of scienter because it did not "achieve the level of specificity" required by the PSLRA).

In their appellate brief, the investors suggest that they cannot compile this more detailed information because they have not yet engaged in discovery and that the district court incorrectly "held Plaintiffs to the burden of alleging . . . how these accounting reports specifically detailed the Company's revenue recognition schemes." The district court, however, was not asking for information that can be obtained only through discovery. For example, the exact amount of money reflected in the reports is not relevant at this stage. But what is relevant is the role of these reports in perpetuating the alleged accounting scheme and the role of these reports in the Defendants' decision-making process. Moreover, because the investors had confidential witnesses who provided generalized statements about the reports, one would reasonably expect those witnesses to be able to provide more details about the reports and to be able to specifically connect them to the Defendants.

The Days Sales Outstanding (DSO) reports are the one type of relevant report for which the investors provided some detail in their complaint. These reports allegedly reflected the false service-invoice scheme because the accounts receivable would age and the DSO would therefore increase. The only connection between these reports and the Defendants, however, is that the Defendants allegedly "monitored" the high DSO. But this general allegation is not sufficient to support a strong inference of scienter.

Other reports cited in the complaint are even less helpful to the investors in creating a strong inference of scienter. The complaint, for example, alleges that the Defendants had access to "Scorecards" in which sales and service employees were

ranked based on the amount of revenue they brought in. But ranking employees based on the amount of revenue they produce is not relevant to whether the Defendants knew that Diebold was reporting false earnings unless these reports clearly reflected the revenue-recognition scheme, which is not alleged in the complaint.

The investors also claim that, in addition to the financial reports, Diebold used real-time data software to track its sales and revenue. Again, however, the complaint fails to provide key information about this software. It does not, for example, explain what the software reflected and what would have been obvious to a reasonable person upon examining the software. Similarly, the complaint fails to connect this software to eight of the Defendants. As for the ninth Defendant, the complaint simply alleges that he "used" the software.

The investors raise similar allegations regarding the Defendants' attendance at weekly and monthly finance meetings "to discuss . . . the Company's financial performance and results." But attendance at such meetings, without more, does not support a finding of scienter given that the complaint does not allege that the revenue-recognition scheme was discussed in the meetings.

Moreover, the investors' allegations regarding the Defendants' access to financial materials and software, and their attendance at meetings, are based solely on two confidential witnesses (Confidential Witnesses #3 and #11). When confidential sources are used to support "vague and conclusory" allegations, the allegations are not "accorded much weight." *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (holding that allegations of confidential witnesses must be discounted and "[u]sually that discount will be steep")). Bare-bones statements, such as the allegation that the Scorecards were "of huge importance to the decision-making of the Company," are the type of vague and conclusory allegations from confidential witnesses that are properly discounted.

Even less weight should be given to the Confidential Witnesses' allegations due to the lack of information about them. *See Higginbotham*, 495 F.3d at 757 ("[A]nonymity conceals information that is essential to the sort of comparative

evaluation required by *Tellabs*. To determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals."). The complaint does not provide any details about most of the Confidential Witnesses, such as dates of employment, job description, employment location or sector, or which Defendants interacted with them. Given the general nature of the allegations and the absence of critical details, the fact that the Defendants received financial reports, had access to real-time financial software, and attended financial meetings is insufficient to support a strong inference that the Defendants had knowledge of, or a reckless disregard for, the falsity of Diebold's earnings information.

### 2.       *Insider sales of Diebold stock*

The Defendants' "highly lucrative and suspiciously timed insider sales" are the second set of facts alleged in the complaint in order to establish scienter. Five of the Defendants sold nearly 40,000 shares on February 11, 2005, two weeks after Diebold reported earnings that pushed the stock near its all-time high price. These five Defendants did not make any other sales during the Class Period.

"[I]nsider trading at a suspicious time or in an unusual amount" is one of the nine factors "usually relevant to scienter" that this court first applied in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001). The fact that five management-level employees sold a significant amount of stock on the same day could be probative of the fact that they knew or at least suspected that Diebold's earnings reports were misleading. Insider trading, however, "is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (citation and internal quotation marks omitted). Thus, "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Id.* (citation and internal quotation marks omitted).

The investors failed to provide such a history. A "meaningful trading history" requires information on non-Class Period sales, the amount of stock retained by the

Defendants, or, as the Defendants allege, whether the amount of stock owned by the Defendants actually increased during the Class Period.  Absent key background information confirming their suspicious nature, the stock sales in February 2005 do not by themselves raise a strong inference of scienter.

**D.        Investors' arguments on appeal**

In their complaint, the investors primarily relied upon the two sets of facts discussed above to establish scienter.  On appeal, the investors argue that the complaint alleges at least seven additional facts that support a strong inference of scienter.  Each allegation is addressed in turn below.

### 1.        *"The Nature and Pervasiveness of Defendants' Accounting Violations"*

The first additional fact relied on by the investors is that the alleged accounting violations were so "basic, pervasive and calculated to mislead investors . . . that they could not be missed unless the Company's executives were engaged in knowing or reckless conduct."  But the "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *Hoffman v. Comshare, Inc. (In re Comshare, Inc. Secs. Litig.)*, 183 F.3d 542, 553 (6th Cir. 1999).  Despite this general rule, "common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 685 (6th Cir. 2004) (quoting *In re MicroStrategy, Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000)).

One cannot determine from the complaint whether the magnitude of Diebold's alleged accounting violations are the type of extreme "in your face facts" that "cry out" scienter. *See id.* at 686.  The complaint does not specify the total amount of revenue that Diebold allegedly overstated.  Nonetheless, Diebold is a multi-billion-dollar company and, as such, the amount of improperly recognized revenue would have to be significant in order to support a finding of scienter.  No such significant figures are alleged.  The investors do not contend, for example, that Diebold "reported *profits* when it should

have been reporting *losses* over *several different* quarters." *See In re Telxon Corp. Secs. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000) (holding that the investors' complaint adequately plead scienter, based in part on the magnitude of the accounting errors) (emphasis in original).

Aside from the uncertainty regarding the amount of the purportedly overstated revenue, the alleged revenue-recognition scheme is not the type of conduct from which scienter can be strongly inferred by the magnitude of the errors alone. The alleged scheme involved different product lines, and the revenue came from three very different sources: uncertified voting-machines sales, software bundling, and false service invoices. Even if the amount of revenue prematurely recognized was significant, it would have been spread out among these different sources and therefore would not likely have served to put the Defendants on notice of the misstated revenue.

### 2. *"The Fact That The Confidential Witnesses Were Able To Describe The Fraudulent Scheme In Detail"*

The second additional fact relied on by the investors to establish a strong inference of scienter is that "several of the confidential witnesses—who were Diebold insiders and knew about the inner working of the Company—were able to describe parts of the fraudulent accounting scheme in detail, and stated that the Individual Defendants had extensive knowledge about the true financial condition and accounting practices of the Company." Nowhere in the complaint, however, are any specific facts alleged that connect the Defendants to the revenue-recognition scheme. Instead, the investors rely on general statements from the Confidential Witnesses, such as that "the false invoicing scheme was perpetrated at a high level within the Company," "[i]t was very obvious what they were doing," and "the false invoicing practice was openly known within the Company." These generalized statements cannot substitute for *specific* facts through which a factfinder can strongly infer that the Defendants themselves knew of or recklessly disregarded the falsity of the earnings statements, especially because the majority of the Confidential Witnesses are not identified as having *any* contact or interaction with any of the Defendants. *See W. Pa. Elec. Employees Benefits Funds v.*

*Ceridian Corp. (In re Ceridian Corp. Secs. Litig.)*, 542 F.3d 240, 248 (8th Cir. 2008) (holding that the plaintiffs failed to meet the PSLRA pleading standard, in part, because they did not "allege specific facts" giving rise to an inference that the defendants knew their statements were false).

### 3.     *"The Proximity In Time Between The False Statements and the Disclosure of the Fraud"*

The third additional fact relied on by the investors is the proximity in time between the allegedly false statements by the Defendants and the later corrections. On August 12, 2005, Diebold stated in an SEC filing that its disclosure controls and procedures were effective. Three days later, another SEC filing stated that such controls and procedures were *not* effective. The investors argue that "[t]he fact that these two statements were made a mere three days apart strongly suggests that Defendants knew the first statement was false when it was made."

"[C]loseness in time of an allegedly fraudulent statement . . . and the later disclosure of inconsistent information" is one of the nine *Helwig* factors supporting a finding of scienter. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001). The difference of only three days suggests that the Defendants knew or had reason to know that their certification that the controls were effective was false when it was made. Proximity alone, however, does not support a strong inference of scienter. *Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004) (holding that the plaintiffs had not adequately plead scienter despite the temporal proximity of statements "because there is no indication from the class members' allegations that [the defendant] knew or recklessly disregarded information it had before it at the time it issued its" allegedly false statements). Because the investors in the present case do not allege any specific facts establishing that the Defendants knew or recklessly disregarded the falsity of their statements, the proximity of the inconsistent statements is not sufficient to support a strong inference of scienter.

### 4.     *"The DOJ and SEC's Criminal and Civil Investigations"*

The fourth additional fact relied on by the investors is the existence of investigations by the Department of Justice (DOJ) and the SEC into Diebold's operations. According to the investors, "as a matter of common sense, the fact that two government agencies armed with access to the Company's internal accounting records have dedicated resources to investigating potential accounting fraud . . . suggests that more is amiss than technical accounting violations or management negligence."

The existence of the DOJ investigation was first pled in the investors' proposed second amended complaint and is therefore not relevant to whether the investors' complaint of record gives rise to a strong inference of scienter. Although a government investigation is not altogether irrelevant to the scienter analysis, a decision by government agencies to investigate a company is not sufficient to meet the heightened *Tellabs* standard on its own, *see In re Ceridian Corp.*, 542 F.3d at 248-49 (holding that an allegation of an ongoing SEC investigation "[w]ithout more" is not sufficient to establish scienter), or even in combination with the temporal-proximity factor discussed above. Government investigations can result from any number of causes, and the investors have not pointed to any facts suggesting that the SEC investigation was the result of knowing or reckless behavior by the Defendants. *See NECA-IBEW Pension Fund v. Hutchinson Tech., Inc. (In re Hutchinson Tech., Inc. Secs. Litig.)*, 536 F.3d 952, 962 (8th Cir. 2008) ("[W]e consider the SEC's opening and closing an investigation irrelevant to the issue of [the plaintiff's] complaint sufficiency. The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false . . . [,] nor does it add an inference of scienter.").

The investors' related argument is that the investigations should have served as "red flags" to notify the Defendants of the accounting fraud. *See, e.g.*, *In re Health Mgmt., Inc. Secs. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (finding that the SEC's investigation into the company's accounts receivable served as a red flag that "should have caused [the company] to investigate further"). This argument is without merit, however, because neither government investigation was initiated until after the close of

the Class Period in 2005, so the investigations could not have alerted the Defendants to the possible falsity of the statements during the Class Period.

### 5.        *"Defendants' Own Class Period Statements"*

The fifth additional fact relied on by the investors is that the Defendants' own statements during the Class Period "show that [they] were intimately familiar with Diebold's accounting and financial reporting practices," and that by participating in earnings conference calls and signing SEC certifications about Diebold's earnings and policies, the Defendants "held themselves out as extremely knowledgeable about Diebold's financial results." But the Class Period statements detailed in the complaint are generalized and relate primarily to Diebold's overall profits and growth. They therefore do not establish that the Defendants were "intimately familiar" with Diebold's revenue-recognition practices.

Moreover, a "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). The investors have provided no contemporaneous facts showing that the Defendants knew or should have been aware that these statements were false. *See In re MoneyGram Int'l, Inc. Secs. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) ("[F]alse [Sarbanes-Oxley] certifications are probative of scienter only if they are accompanied by allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it." (citation and internal quotation marks omitted)).

Finding scienter based on these allegations would be equivalent to "the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." *See Miss. Pub. Employees' Ret. Sys. v. Boston Scientifc Corp.*, 523 F.3d 75, 91 (1st Cir. 2008). Without specific allegations showing that the Defendants either knew of or recklessly disregarded

the falsity of their own statements at the time the statements were made, the fact that their statements later turned out to be false is irrelevant to a cause of action under the PSLRA.

### 6.     *"The Statements Contained in the Internal Jones Day Memos"*

The sixth additional fact relied on by the investors is that Jones Day, a law firm serving as outside counsel to Diebold, prepared two memos in 2003-2004 regarding whether selling uncertified voting machines to California counties would constitute a breach of contract and whether voting systems could be modified without California's approval. These memos concluded that such sales would likely breach Diebold's contract with California and that California's approval would be needed for system modifications.

According to the investors, these memos "show that Diebold's top executives knew or should have known that the Company could not report revenue from sales of voting machines that did not comply with state election laws because these voting machines would result in a breach of contract." These memos, however, are not probative of the Defendants' state of mind because the complaint does not allege that the Defendants ever read, received, or were informed of the existence of these memos. The memos, moreover, have nothing to do with whether revenue could be properly recognized from the voting machine sales. These memos therefore could not have put the Defendants on notice that revenue from the voting machines would be improperly recognized.

### 7.     *"Defendants' Inability to Come Up With Any Plausible Non-Fraud Explanation for the False Financial Statements"*

The final additional fact relied on by the investors is that the "Defendants have provided no alternative non-fraud explanation for their false and misleading statements during the Class Period." But this court has never held that a securities-fraud defendant must proffer a nonfraudulent explanation, and we decline to do so now. The PLSRA and

the Supreme Court's opinion in *Tellabs* make clear that the burden of proof, at this stage of the proceedings, rests with the investors.

Moreover, the Defendants *have* provided nonfraud explanations for several allegations raised by the investors. To rebut the argument about suspicious insider trading, for example, the Defendants point out that the February 2005 sales were explained in public SEC filings as representing "a withholding for taxes incurred when certain defendants earned common shares of the Company's stock for the 'performance period' of 2001-2003 under the Company's Performance Share Program."

**E.       Remaining *Helwig* factors**

The investors' complaint fails to allege any of the seven remaining *Helwig* factors. They do not allege, for example, "bribery by a top company official," "disregard of the most current factual information," "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication," "personal interest of certain directors in not informing disinterested directors of an impending sale of stock," or a "self-interested motivation of defendants in the form of saving their salaries or jobs." *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001).

The investors further fail to allege that the external financial statements published by Diebold diverged from the internal reports. *See id.* Indeed, the investors heavily rely on the fact that the internal reports should have informed the Defendants of the revenue-recognition scheme, thus suggesting that both the internal reports and the external reports reflected the alleged premature recognition of revenue. Finally, the complaint does not allege the "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of the suit." *See id.* The complaint does reference a false-claims suit by the state of California, but it does not allege that the settlement of that suit was suspiciously quick or otherwise improper.

Given the absence of any of these other *Helwig* factors, and the general and conclusory allegations discussed above, the investors' complaint does not "state with

particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2). We therefore conclude that the district court did not err in holding that the investors' complaint failed to adequately allege scienter.

**F.       Investors' proposed second amendment to complaint**

The investors' final argument on appeal is that the district court erred in failing to explain its refusal to permit the investors to file a second amended complaint. Ordinarily, when a district court "fails to state a basis for its decision to deny a motion to amend," it has abused its discretion. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). If the "proposed amendment would have been futile," however, the abuse of discretion amounts to harmless error. *Id.* A proposed amendment is futile if the complaint, as amended, would not withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Id.*

As amended, the complaint would have contained information about post-Class Period restatements of earnings, delays in filing financial reports, an investigation by the DOJ, and Diebold's decision to withhold compensation from several Defendants "[i]n light of and in connection with the pending restatements." But none of these additional facts would have satisfied the *Tellabs* standard because they relate primarily to post-Class Period events. They do not shed any light on whether the Defendants, at the time the earnings statements and SEC certifications were made, knew of or were reckless regarding the falsity of those statements or certifications.

The investors' proposed second amended complaint would also have added a fourth scheme by which Diebold allegedly recognized revenue prematurely: "Defendants systematically billed customers, and recognized revenue, for ATM's that had not been delivered or installed." The investors relied heavily upon this alleged "bill and hold" scheme at oral argument to suggest that the complaint gave rise to a strong inference of scienter. Specifically, the investors claimed that Diebold had used the bill and hold accounting method for many years, but failed to mention the use of this method in its SEC filings and other public reports, therby committing a securities-fraud violation.

This allegation, however, does not appear on the face of the proposed second amended complaint.

Moreover, the allegations in the proposed second amended complaint about the bill and hold ATM scheme relate primarily to the scope of the alleged scheme, not to the Defendants' state of mind. The investors' proposed amendment would thus have been futile, and the district court's failure to justify its refusal to permit the amendment was harmless.

## III.  CONCLUSION

In sum, we conclude that neither the complaint nor the proposed second amended complaint states "with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Any inference of scienter is not "cogent" as required by *Tellabs*, but speculative and supported only by general and conclusory allegations that fail to connect the Defendants to the alleged scheme. For all of these reasons, we **AFFIRM** the judgment of the district court.